Here we hear the first case for oral argument, and my colleague, Judith Smith, has supported Thank you, Judge O'Scanlan. I appreciate it very much. It's my privilege to be on the panel this morning and to make a few very brief remarks about my distinguished colleague, who is our presiding judge today. Some of you may be aware that Judge O'Scanlan advised the President of the United States recently that effective December 31, he will take senior status after a service of 30 years as an active judge on our court. What that means is that since this is our last hearing, this is his last day as the presiding judge. He has done that many, many times with distinction. And before we go forward, I just want to put into context a little bit about Judge O'Scanlan's career on our court. Of course, I'm sure there will be many articles and so on. And as he himself, I'm sure, would appreciate, this is not a funeral. He's going to continue to serve. He's going to continue to serve on the court, not as an active judge. But during, according to the research that we've done in the 30 years that Judge O'Scanlan has been on the court, he has participated, before today, in 4,832 cases. He has authored 610 majority opinions and 97 dissents, perhaps even more significantly in terms of the law of the United States. And this is only since 2000 when our court began to keep track of this. He has authored 37 dissents to say or to take a case en banc, which is part of our en banc process, 27 of which have later had certiorari petitions filed with the United States Supreme Court, and 16 of which resulted in grants of certiorari. In terms of law, it's very important to note that 13 of those resulted in a reversal of Ninth Circuit law. In other words, a 93% success rate on those that were actually appealable. So, as I said, I'm sure there will be a great deal of ink spilled over the next many years in evaluating the great career of our colleague. But I wanted to just take a moment this morning on this last day of our colleague serving as presiding judge to acknowledge, thank, and really salute him for his great service to the court as an active judge. Indicate that we all, and I'm sure I can say this for Judge Bill, we look forward to continuing to serve with Judge O'Scanlan. But I wanted to just give this brief accordion and thank you for your service. Well, thank you very, very much, Judge Smith. This is a totally unexpected ceremony. I'm very happy that you emphasized this is not a funeral. I have told the Chief Judge that I will continue, as a senior judge, to sit roughly half-time, so I intend to continue to sit. I've been very, very privileged to have magnificent colleagues, yourself, Judge Kuhl, and all of the members of the court. It's just been an enormous pleasure for me and a great satisfaction and a huge honor to be able to serve for 30 years, and I look forward to many years more. Not 30, but a few years more. Well, now that we've got all of that out of the way, again, thank you very, very much. We will call the docket. We have the first case for oral argument today. I should mention one other thing. We have a lot of cases today, and we have decided that we're going to have a recess after the third case. In other words, after the Tenure v. Wells Fargo case. We will break for 10 minutes or so, so that any of you that are here for the E. West v. Hilda River case or for the Dowers case, you can have a recess. I expect that we will not reach that case until close to, let's say, 11 o'clock. So, with that guidance, I will call the first case for oral argument, which is Smith v. United Airlines. Counsel for the appellate, you may proceed. Good morning, Your Honors. May it please the Court, my name is Dow Patton. I represent the plaintiffs and appellants, Mr. Smith, Moody, and Tran. Your Honors, this case presents two primary questions. One of, and I'm sorry, I'd like to reserve five minutes. Thank you. Two primary questions. One, did the plaintiffs below the appellants timely bring their claims to court? And second, did they state a claim for a hybrid claim of breach of duty of their representation and breach of contract against their employer and their union? The first, we did get counsels for an appellee's letter regarding the Rollins case. The Rollins case didn't have a timeless file issue, but it is very instructive to the Court. The Rollins case felt that whether or not it's arbitrary or about faith or misconduct, these are questions of fact. The Rollins case was resolved in summary judgment in favor of the union. And it was reversed because the factual question of whether the underlying conduct itself was arbitrary or not is something that has to be borne out by discovery. And in this case, we've got something very similar. Did the reason for not granting workers at SFO, the guys that put the bags on the airplane, did the United's treatment of them and the union, the treatment of them as less than their counterparts in other airports throughout the system, was that in itself arbitrary? And we also had merits-based issue counsel. I wonder if you could spend a minute with me on the potential petitions matter. Absolutely. I looked at the record and it appears that your clients need to show that their claims didn't accrue or that they were aware of them before October 16, 2013. Do you agree with that? Your Honor, the standard is what they knew or should have known, that the union would not process their agreements further. Your Honor, as I look at it, nothing can have happened before that time or there's a statute problem. And so I see it there are two things. First of all, Moody and Tran were told that the union wouldn't be filing complaints on their behalf before that date. And there are counsels that I don't know if you were telling that, but as of August 2013 indicated that the workers knew their agreements were not being pursued because the letter asked when the union was going to commence the agreements. Either one of those, it seems to me, it looks like missing something says that your clients knew or should have known before October 16 that the union was not going to proceed. What am I missing? Your Honor, there's a couple of issues there. One with respect to Moody and Tran. They were informed that they couldn't open the grievance because one was open. That's the key, that it was an open process. And throughout this, it's our concern. So they were informed that the union would not be filing a complaint on their behalf? Yes, because there was one open, Your Honor. Because they claimed, the union claimed to the plaintiffs that we don't have multiple grievances on the same issue. If it's open, it's going to apply to everybody. In your view, when did the statute start to run? Your Honor, it's our position that the grievance is still open, but it became clear when the new contract was negotiated in November of 2013 that that is when, and these are the facts that we could have alleged in our third issue in our opening brief, Your Honor, was there are additional facts. Those additional facts would be that the plaintiffs were told this will be taken care of in the new contract. Well, but how do you deal with your letter? I don't mean to put you into it if that wasn't you. It was, Your Honor. Your letter in August of 2013 said that, yes, if the union commits and moves a grievance process, how do you reconcile that language with what you're now saying that suggested the union just kind of said, well, we're where we were going? So the date of that letter and the negotiation of the new pre-merger, of the new post-merger agreement between Continental and United Airlines was the reason why we wrote the letter, because we believed that the issue needed to be resolved before the new collective bargaining agreement was addressed. Your Honor didn't say anything about that, did it? It said pre-merger, and that's why the time was of the essence. So that's what triggered the letter, was the merger? Yes. So we were approached by a number of different plaintiffs, and we do not identify in that letter who the plaintiffs are that approached us, and in our second amendment complaint, it is alleged as a class action on behalf of all of the ramp agents who were denied this case at San Francisco Airport. But the reason why we wrote the letter is because there are a number of different people that approached us. Some of those ended up being our clients, and we found lost company. You said that when you asked the union to, in quotes, commence the grievance process, you weren't referring to your clients you're representing today. You were representing some other people unidentified in the letter that were part of a class action. That's correct, Your Honor. Did you make that clear in the letter? We did not. We did not identify anyone in the letter, Your Honor, because there were a number of different people that some chose to hire, some chose not to go forward with the loss. However, as a class, they would have the opportunity to opt out. Now, with respect to that, I do have to point out that the counsel's letter does contain a misquote, the letter of December 9th. It contains in quotes, commence a new grievance. There is no new reference to new in that letter. It's a commence a grievance process. Whether it was stalled, whether it was a new one, commence a grievance process is what we were requesting. The response was nothing, zero, never. No communication whatsoever. So, if a plaintiff has their counsel say, hey, we have this merger, the merger and the new collective bargaining agreement coming up, we want this issue resolved, before then, it would seem to me that the appropriate trigger, and the district court's opinion does not say when the cause of action accrued and what the trigger was. The trigger would be the new collective bargaining agreement. Or would it be, you're their attorney, you're a smart guy, you knew nothing was happening, you said, get this going, let's commence it. So, whether it was for these plaintiffs or the class action plaintiffs overall, as of August 2013, you knew they hadn't done anything, and you asked them to commence it, right? That's correct. We asked them to commence the grievance process. And, you know, when you send out a letter, you can put any time frame you want in there. It's your choice. But the real question is, is, do you, is it the proper policy to keep these claims out of court based upon this type of an accrual analysis? Did they sleep on their rights sufficiently? Well, that's really what statute of limits did, but a lot of people don't like them. The legislature has determined in its wisdom that these things become stale if you want to preserve your rights, you've got to act within a certain period of time. And the problem that we're struggling with here is, did your clients know, or should have known, through their counsel and otherwise, that they had certain rights and they needed to do something within a certain period of time? So that has to be counterbalanced, Your Honor, with the rights of the employer and the union to extend indefinitely. They have the power to extend indefinitely a grievance, to hold it in a grievance. And what communication from the union would you cite to that indicates that they agreed to any such thing? Hold on. We're going to take, this will be taken care of in the new collective bargaining agreement. Is that what they said? They did. Now, those were the, those were the allegations that we proffered. That's what you said. I'm just saying, what documentation from the union, what statement by a union official do you refer to that gives any credence to the idea that they agreed to indefinitely extend the grievance? The plaintiffs are without the benefit of discovery, and they're without the, I understand, Your Honor. So the statement by the union to Mr. Smith was, this will be taken care of in the new collective bargaining agreement. Hold on, first. And then, second. And when was that made? That was made before August of 2013. A year letter comes in August. Correct. And so, that statement of hold on will do it when you take it in context with the rights of the union and the employer, under the collective bargaining agreement, to indefinitely extend, leads to a rational conclusion by somebody looking at it from a plaintiff's standpoint. They're holding on to it. It's open. And they're going to do something about it when the, when the new collective bargaining agreement is. There's a few of us, the four minutes left. Do you want to say anything about the duty of fair representation? Yes, briefly, Your Honor. The duty of fair representation is key here because the conduct was arbitrary, and it was not a mere exercise of judgment. This is not where the union came in and said, hey, you know what? We don't completely, we understand what you're arguing about, and we've done our analysis, and here's our position. Let the plaintiff know, let the union member know what it was, what's your best case limit. We cited, is there a T? I'm sorry, Your Honor. They're in the window. Yes. Oh, no. Briefs. Broughts. Yes, I'm going to, as well, Your Honor, it's, there was the decision whether or not, there's two issues. One is the underlying conduct, which is why are people at SFO not entitled to the same amount of pay as everybody else around the country? I'm focusing on the judgment issue. That's, I'm not sure whether it's judgment or whether it's arbitrary. Correct. And the question of whether, of how to process the grievance and say, yes, is this, is this, does this have merit or not? That, there's no evidence that that ever occurred. There's absolutely, there's no evidence and there's no allegation that it actually occurred. It's our position that the grievance was open and remains open because they have been communicated with to say, we've considered it, we've rejected it. You're down to two minutes. Counsel, you may want to reserve those. Yes, Your Honor. Thank you. You're on the other side. Good morning. BFJ Support. My name is Michelle Gerke. I'm counsel for Defendant Pelley, United Airlines. With me today is Ira Gottlieb, counsel for the union IAM. We'll be splitting our time, so I will try to leave Mr. Gottlieb seven and a half minutes. Very well, yeah. Fifteen minutes between you. Correct. Thank you. There are three issues before the court this morning. First has to deal with the statute of limitations issue that we spent a lot of time talking to Mr. Patton about just now. And I'll be primarily addressing those issues. Mr. Gottlieb will primarily be addressing the issue of the union's duty of fair representation and then the issue of whether or not the intervention had been granted. I'll be happy to address any issues that the defendant wants to discuss. As the court has rightly noted, the issue is whether or not plaintiff's claims, whether they accrued prior to six months of filing their complaint. And under the Lindo, the standard is whether they knew or should have known of the alleged breach of the duty of the fair representation. And I believe counsel misspoke when he said that the district court did actually not identify a date. The judge did say in her order that she believed the claim to accrue no later than August 2013, and she primarily relied on counsel's letter to the union asking them to commence the grievance process. And you rightly zeroed in on this issue of the language in the letter which asked them to commence the grievance process. And, in fact, on the second amended complaint, plaintiffs took out the word new grievance in the second amended complaint. And if you look at the first amended complaint, it actually did say new grievance. So we believe that that was artfully omitted to try to make it look like they were not actually asking the union to start a new grievance. And, in fact, if you look at the allegations in the first amended complaint in paragraph 36, plaintiffs alleged that they requested that the union start a new grievance with the intent to get a resolution to dismiss grievance, which would allow other RAMP agents the opportunity to grieve issues related to the RAMP agent pay. Counsel, what difference do we owe to the district court's determination that August was the date, if you will, the commencement date? Well, as the court's aware, it is a de novo review at this point, but I do think that the district court does deserve some deference in their view of the plausibility of the claims out pledged in the second amended complaint. And when you view the four corners of the second amended complaint itself, it's very clear that the claims are barred by the statute of limitations. And if you go even further and look at the allegations in the original complaint, as well as the allegations in the first amended complaint, it's even more clear that the claims are time barred. Because when they filed the second amended complaint, they omitted many of the damaging allegations that were included in earlier versions of the complaint where they explicitly alleged that they were told that the union had sided with United and that there was not going to be a grievance hearing commenced on this. And it's because the union rightfully understood that there was local variation at SFO and that the RAMP agents were not going to be paid the card person lead pay and that this was something that was part of the collective bargaining agreement because of the side letter which contemplated this local variation. And the grievance exercised their judgment, I mean, sorry, the union exercised their judgment on the grievance and realized it had no merit and they didn't want to process the meritless grievance, which is well within their judgment to do. Did the district court pay attention to the, if you will, carving up of the initial complaint, its reconfiguration in an amended complaint in determining the statute of limitations issue in this case? No, Your Honor. She did not. She was concerned with the Ninth Circuit's holdings in PAE and felt that she really had to rely solely on the four corners of the second amended complaint. We did bring to her attention some of the contradictory allegations that were amended from one version of the complaint to the other because we felt that it went to the plausibility standard and plaintiff's ability to plead a claim that could withstand a motion to dismiss. But she was very careful to say, I need to look just at what's in the second amended complaint and relying solely on those allegations, primarily counsel's August 23, 2013 letter, but also the statements that were made in the allegations that the union members were told, this is the way it's done in San Francisco, we don't need these in San Francisco. All those allegations, I believe, formed part of her judgment that the claims are time-barred. I also want to briefly touch on this issue that there was some kind of mutual agreement to extend the time consideration for the grievances because that is the second theory that the plaintiffs put forth in the second amended complaint. And this kind of goes to your question of should we only be looking at the second amended complaint or should we be looking at the first amended complaint as well? And in the first amended complaint, and the additional complaint as well, I believe, the plaintiffs alleged that the grievance had not even been presented to United and the district court relied on that when it granted defendants first motion to dismiss the first amended complaint because the grievance procedure within the collective bargaining agreement specifically states that the time limits in the grievance procedure can only be extended by mutual agreement. And then plaintiffs alleged that the union had not even presented the grievance to United. So how could United have mutually agreed to extend the time limits? I've forgotten probably the actual example, but were the complaints in this case verified? No, they were not, Conor. Nonetheless, obviously we feel that counsel must have some basis to plead these very specific allegations and very specific and repeated statements. He named very specific union officials that made these statements allegedly and even provided some date and time frames. So it was not just very general, and they were not made on information and belief, which is his tactic that he took in the second amended complaint. So from your perspective, then, the variation in statements pretty close to plausibility and or equalitarily more than anything else, is that right? I would agree, Your Honor. I think it does go to the plausibility standard, and I think it also goes to the need to amend in the issue of futility. You know, the court in the oral argument on the motions to dismiss the second amended complaint gave counsel an opportunity to explain, you know, where he was coming up with these allegations, what factual basis did he have, and how would he propose to amend the complaint further, given that opportunity, and he was not able to articulate what exactly he would do. And I would note that this allegation that they were asked to wait until after the new 2013 collective bargaining agreement was ratified, that actually was in the first amended complaint, and they took it out. So his proposed amendment for, you know, a hypothetical third amended complaint is something that was just going to add back in what he already had in the first amended complaint. So I would like to reserve some time for Mr. Gottlieb. So unless the panel has any more questions, I'll defer to him. No further questions, Ms. Gottlieb. Thank you very much. We have the remainder of the time. Good morning, Your Honor. I'm Congressman Edward Gottlieb. I'm going to represent the proceedings in the Clause 1781. I'm an ally, and I think I won't pick up kind of where Mr. Patton was, where Mr. Guilty was, but I think we can start with the idea that it's too important to correctly determine how to say a written complaint, so it does not say valid complaint for a breach of the duty of federal representation. I think the proceedings really essentially reflect a few things alone. No more than the plaintiff's objections to the interviews were chosen to process their grievances. In fact, those objections do not allow more state of the art duty of federal representation. Sir, are we as a panel really compelled to determine whether what the record shows the union did was an exercise of judgment? That's right. If it was an exercise of judgment, then you wouldn't write it. If it was an exercise of judgment, then it cannot be arbitrary on the basis of an unanswered question. What we're saying is that the union has the right, if it's an exercise of judgment, to decide even if it's wrong or even if it makes an error of judgment, that if it is an error of judgment, then it cannot be an arbitrary violation of the duty of federal representation. So why don't you respond to Mr. Patton's argument that essentially the union did nothing? Well, Your Honor, that's kind of dictated by their own pleadings. First of all, there's pleading. There are allegations that the union filed grievance with the employees, filed grievance with the union, and that the union said, you know, he leads San Francisco. You know, this is the way it's done in San Francisco. Those are paragraphs 10 or 11 of the second amendment complaint. In the first amendment complaint, you're more explicit or you're more filled with some more telling allegations. In the second amendment, what they said in the first amendment complaint, that the union, the airlines was operating properly in response to their allegations. So that's on the merits of saying, we think, well, it wasn't, it didn't get into the law analysis. It really doesn't have to. This is the kind of allegation where people know what they're getting paid. There wasn't any question. I kind of wasn't asked about what they were getting paid or what work they were doing. So, but there's a contractual side letter, 74-8M, to the Supplemental Inserts Record, page 126, which basically says, we recognize, the insurance company recognized different stations, and obviously United International Airline, will operate and deploy their ramp servicemen differently because there are different large and small stations, different populations of employees at each station, different ways of operating, larger or smaller, and more stringent in the flow of business from one station to the other. So, that at least gives you a basis for saying, that the union had an interest in this judgment because they were, in the first amendment complaint, there were allegations that the union representatives told employees, this is what he's done. We, as I can probably add, on the hand conversations, the union reps sided with the United International Court from the first amendment complaint. So, from your perspective, there's an agreement between UAL and the union that permits the very, if you will, variation among airports and the way ramp workers are treated when opponents kill clients, talk to the union representative, and they said, look, UAL didn't put this up here. This is okay. This is reasonable. There's, in fact, referring back to an agreement, a memorandum of understanding, and from your perspective, that justifies the action, this judgment, and that arbitrary action. Whether or not the union is correct or not, that is part of the basis of a judgment. It puts it into the realm of a judgment. Right or wrong, we're not saying, the prototypical arbitrary kind of, by the unions, would be in a discharge case and cases like that where the union just blew it, the time deadline, and because of that deadline, which was in a discharge case, a discharge activity, the employee lost all her right to believe it was a female caller for her rights. She couldn't figure out triggers. She found these agreements untimely. The discharge stands because the union was untimely. That brings me to the exception of a limited one like this court where the rights are very important and where it's completely extinguished by something that really characterizes gross negligence. That, again, qualifies arbitrary over here. Once you get into the realm of the union looking at something, where is he in it? It isn't the encyclopedic analysis of what's going on. I think this court also told us about the amount of analysis, the amount of investigation, the amount of contemplation depends on the complexity and the importance of the case itself. Here, it was pretty apparent what was going on, and there wasn't a whole lot of investigation or deliberation that was needed, and that was communicated immediately according to the first union and the second union. Anything further? I'm sorry. Anything further? The only thing I would just add is that, okay, well, I think this case, the way that I think it's pretty clear, you get here, the allegations do not exceed the feasibility of a lawful conduct of the union, and, therefore, for that reason and reasonable reason, I think I'm going to bring it down. I think that's good. The court is fine. You've touched me plenty. Thank you. Thank you, counsel. Mr. Patton, you have some reserved time. Thank you, Your Honor. Glendo says the context matters when we're looking at the running of the statutory period. Context matters. Here we have this policy of we're only going to allow one open grievance at a time on a particular issue. That's part of the context. The other part of the context is we have pending contract negotiations after a large merger between very large unions. The upshot of the district court's ruling is you have to go file a lawsuit in the middle of contract negotiations. That would be contrary to the union's interest. It would be contrary to everybody's interest. The last point I'd like to make is with respect to the analysis that Your Honor was talking about with my colleague, that there was no analysis here. There was no analysis. There was no communication with the employee other than some moronic assertions about that's not the way we do it or things like that. There was no analysis of the underlying differences between SFO and O'Hare. There was no analysis of why these people are being treated differently when they come to San Francisco. Thank you, Your Honors. Thank you, counsel. The case just argued will be submitted for decision.
judges: O'scannlain, Gould, M. Smith